## FOSTER vs. HOLLY.

[ACTION TO RECOVER DAMAGES FOR LOSS OF SLAVE.]

1. *What is care or negligence on part of stationary vessel.*—Although it might be affirmed, as a legal proposition, ‘ that if a skiff was fastened in a safe and secure place unless rendered insecure and unsafe by the negligence of a passing vessel, she was not in an improper place, and was guilty of no neglect by being at such place’; yet it certainly would be in an improper place, if fastened in a manner which rendered it difficult to be removed, in the channel of a river along which vessels were frequently passing.

2. *Same, by vessel entering harbor.*—A vessel, entering a harbor, is bound to exercise ordinary care to prevent accidents; which is a question of fact, to be determined by the jury from the character of the harbor, the number of vessels accustomed to frequent it, the time of the day or night when the vessel enters, and the other circumstances of the particular case; and a charge to the jury, instructing them that such vessel "is bound to keep the most vigilant watch," is an invasion of their province.

3. *Liability for damages between colliding vessels.*—To preclude a recovery of damages for injuries caused by a collision between two vessels, on the common-law doctrine which denies a recovery to either party where both are at fault, the plaintiff's fault must have occurred at the time of the accident, and contributed proximately to it; but, if the consequences of the defendant's negligence, which caused the injury, might have been avoided by the exercise of ordinary care on the part of the plaintiff, his failure to exercise that degree of care precludes him from any redress.

4. *Same.*—Although the act of fastening a skiff in the channel of a navigable river, along which vessels are frequently passing, in such a manner that it cannot be conveniently and expeditiously removed, is an act of negligence on the part of the owner, or person having charge of the skiff; yet it cannot be said to contribute proximately to a collision with a passing vessel, caused by the negligence of the persons in charge of the vessel, and, consequently, does not preclude a re-

covery against the owners of the vessel for damages resulting from the collision.

APPEAL from the City Court of Mobile.
Tried before the Hon. ALEX. MCKINSTRY.

THE complaint in this case was in the following words.:

"W. D. F. Holly ⎞    The plaintiff claims of the defend-
    vs.          ⎬  ants fifteen hundred dollars, for that
David Foster, and ⎛ whereas, heretofore, to-wit, on the
William Foster.   ⎠ 23d day of October, 1859, a certain
schooner, called *Clotilda*, of which one Wright is and was master, and which is and was at the time the property of said defendants, was sailing up the bay of Mobile, between Pilot's island and the city of Mobile, while a skiff, or small boat, in which was a slave named Alfred, the property of plaintiff, of the value of fifteen hundred dollars, was lying still on the waters of the bay, tied to a sawyer, or log, therein situated; and the master and crew of said schooner navigated and managed her so carelessly, and with such gross negligence, that she ran afoul of the said skiff, causing said skiff to be upset and submerged; whereby said slave was drowned, deprived of life, and wholly lost to plaintiff."

The cause was tried on issue joined on the plea of not guilty. "On the trial," as the bill of exceptions states, "the evidence tended to show that, on the morning of the 23d October, 1859, which was Sunday, the negro Alfred, who belonged to the plaintiff, got into a skiff, with a white man, to whom the skiff belonged, and went out in front of the city to fish; that the skiff was fastened, by a chain, to a snag in the channel of the river, where boats and vessels continually pass and repass; that the skiff was nearer the eastern than the western shore, two-thirds of the distance being on the western side; that said snag had been in that part of the river for several years, but had been removed about a month or more prior to that time, and had drifted about fifty feet south of its former position; that the chain, by which the skiff was fastened to the snag, was from twelve to fifteen

feet long, and the skiff had floated, with the tide, some twelve feet below the snag; that the schooner *Clotilda*, which was owned by the defendants, was coming up the river, against the tide, between ten and twelve o'clock in the morning of that day; that said schooner, when first seen, was distant from the skiff about a quarter of a mile, and was in the channel of the river commonly used by all vessels, ascending or descending; that the wind at the time was north-east; that a little while before the schooner reached the skiff, and when distant from it between one hundred and fifty and two hundred yards, all hands on the schooner were engaged in taking in sail, preparatory to landing at one of the city wharves; that when the schooner was about thirty yards from the skiff, one of the men on her, while hauling in the flying-jib, observed the skiff about thirty yards in front, and gave the alarm, ' Boat ahead'; that the mate of the schooner immediately gave the order to luff, and the wheel was immediately put down, which turned the schooner's head to the east; that a collision between the schooner and the skiff occurred before the course of the former could be changed after the alarm, and the plaintiff's said negro was drowned; that the white man in the skiff clung to the anchor which was hanging to the bow of the schooner, and was saved by the crew; that a boat was lowered from the schooner, to search for the negro, but, not finding him, and a sail-boat coming up to render assistance, the schooner pursued her course.

"The evidence further tended to show, that the schooner was going at the rate of three or four miles an hour, but had slackened her head-way, before the collision occurred, by taking down her sails. A witness, who was on the schooner, stated, that he got a glimpse of the skiff just before the order was given to take in sail, but thought from her position that she was playing about the river, and did not know that she was fastened; that he did not notice the skiff any further, and did not give any notice that he had seen her. It was in evidence, also, that the persons in the skiff had an uninterrupted view of the schooner approach-

Foster v. Holly.

ing them for a quarter of a mile off, and made no effort to get out of the way of the schooner until she was near them, when the white man tried to unloose the chain, but did not succeed, and the negro tried to push the skiff off, but could not; and that the skiff could have easily gotten out of the way of the schooner, if she had not been fastened. It was also in evidence, that the persons in the skiff cried out to the schooner, and raised a paddle as warning when the schooner was near; but their cries were not heard, and the paddle was not seen, by those on the schooner. It was in evidence, also, that the course of a schooner, of the *Clotilda's* size, and going at the rate she was, might or might not be changed, within one hundred and fifty or two hundred feet; but the ease and quickness with which it could be done depended much on the sailing qualities of the vessel, and on the quickness with which she answered her helm. It was further in evidence, that the space between the eastern shore and the snag was about one hundred and thirty yards, and about two hundred yards between the snag and the western shore; that there was water enough on either side of the snag for the schooner to pass; that the schooner was of about one hundred and twenty tons' burden, and was returning to Mobile from Texas; that she had no pilot on board, but was under the charge of the captain, who had served as such for twenty years, had been to and from the port of Mobile for about nine years, and, within the last two or three years, had several times piloted his own boat up and down the channel, and was well acquainted with it; that said schooner had her full complement of men and officers, but two of the men, though on duty, were sick; that the captain was acting as pilot at the time of the collision, and was at the helm, and that the customary look-out was kept. It was in evidence, also, by pilots on said river, that it was usual and customary for masters of vessels of the size and tonnage of the *Clotilda*, well acquainted with the channel, to take their own vessels into port without a pilot; that at the time said schooner was ascending the river, and while some

'four hundred yards from her, another vessel, about the same size, or somewhat larger, called the *Victory*, was seen 'descending ; that the two vessels were approaching each 'other at the rate, respectively, of four and five miles an hour, and each was watching the other, being apprehensive of a collision ; that 'there would have been great danger of a collision between the two vessels, if the *Clotilda* 'had changed her course to the west, she being to the east of the *Victory*, and that she would have run aground if she bore to the east ; that the schooner ran across the chain, 'by which the skiff was fastened to the snag, drew the skiff in, and struck her, scraping the snag, and thus overturned her ; that no cry from the skiff was heard on the schooner, 'and no signal was seen ; that those on board the *Clotilda* 'did not know, until after the collision, that the skiff was fastened ; that if the skiff had not been fastened, it would, 'from the manner in which the schooner struck it, have passed safely along the side of the schooner; and that if it had not been fastened, a push, given to it by one of the 'men just before the collision, would have 'cleared it of the schooner, and the collision would not have'happened. The proof tended to show, also, 'that there was plenty of room east of the snag, and plenty of water 'for the schooner to pass the skiff on that side, though one of the defendants' witnesses thought there was not; also, that the snag could be seen two or three hundred yards off, and was seen by the pilot of the *Victory* one hundred and fifty yards above the place of collision; and said pilot also saw, at that distance, before the collision took place, that the skiff was fastened to the snag. The tide was running out at the time, and the *Clotilda* was coming up against the tide. The white man who was on the skiff testified, that the skiff was on a line between the snag and the schooner when first seen by him ; but other witnesses testified, that the skiff was lying across the stream, with her head to the east."

The above being all the evidence introduced, the court 'charged the jury, at the request of the plaintiff, as follows:

" 1. It is for the jury to determine whether both or either of the parties was guilty of negligence.

"2. The jury are to judge whether the plaintiff was at fault in fastening the skiff to the snag; and if they belief that, by fastening her to the snag, she was in a safe and secure place, unless rendered insecure and unsafe by the negligence of the schooner, then the skiff was not in an improper place, and was guilty of no neglect by being at such place.

"3. A vessel, entering a harbor, is bound to keep the most vigilant watch, to avoid a collision with other vessels, at anchor or in motion.

"4. Because a skiff, or a small boat, is in a wrong place, it will not justify a schooner in running over her, if she could have avoided it by proper diligence."

The defendants excepted to the second and third of these charges, and then requested the court to give the following charges :

"1. If the jury believe, from the evidence, that the schooner had, at the time of the collision, a sufficient number of competent officers and men for her management, and they used ordinary care and diligence to prevent a collision with the skiff, then the defendants are not liable for the consequences of the collision.

"2. If the skiff was chained to a snag in the channel of the river, and in the common track of vessels passing up and down the river ; and those in the skiff could see the schooner coming up on them, and did not make timely efforts to loose the skiff and get out of the way,—then the plaintiff cannot recover.

"3. If the evidence shows, that those who had control of the skiff fastened it, with a chain, to a snag in the channel of the river, where boats and vessels were known to be passing and repassing continually, the persons in charge of said skiff would be chargeable with a want of proper care and prudence, and the defendants would not be chargeable with the consequences of the collision, if the master and

6

crew of the schooner exercised ordinary care to avoid the collision. .

"4. If the jury believe, from the evidence, that the persons in charge of the skiff placed her in the channel of the river, where vessels were constantly passing and repassing, and, by fastening her with a chain to a snag, prevented her from getting out of the way of the schooner, the plaintiff must abide the consequences of the misconduct of those in charge of the skiff, and cannot recover in this action.

"5. If the jury believe, from the evidence, that there was a want of due care and diligence on the part of the master and crew of the schooner, in not avoiding the skiff, and that this negligence could have been avoided by the exercise of due diligence and ordinary care on the part of those in charge of the skiff, then the plaintiff cannot recover. .

"6. If the jury believe that the person in charge of the skiff, with the plaintiff's negro, took the skiff on Sunday morning, and fastened it with a chain to a snag, near the middle of the channel of the river, where boats and vessels are passing constantly.; and that the skiff, when the danger of a collision was apparent, could not be removed out of the way of the schooner, in consequence of being thus fastened,—then the plaintiff cannot recover in this case.

"7. If the jury believe, from the evidence, that the persons in charge of the skiff fastened her to a snag, in the channel of the river, where vessels were constantly passing, and repassing, and remained there several hours, and that the schooner ran over her while in that condition, and the negro was drowned; then, the plaintiff cannot recover, unless the negligence of the master and crew of the schooner was gross or wanton. .

"8. If the jury believe, from the evidence, that the master and crew of the schooner used ordinary care and diligence in coming up the river, and seeing the skiff at one hundred and fifty or two hundred feet in the channel of the river, but not knowing that she was fastened, made no efforts or arrangements to avoid her ; and that the master

Foster v. Holly.

and crew of the schooner only became aware of the true condition of the skiff when it was too late to avoid a collision,—then, it could only be required of them to exercise such care and diligence, in the management of the schooner, as to do no more injury than was inevitable.

"9. If the jury believe, from the evidence, that the master was prevented from sailing farther to the west by the belief that his schooner would probably have come in collision with the *Victory* ; and that the master and crew of the schooner, so soon as they discovered the situation of the skiff, used their best skill and judgment, and employed the means at their command, to avoid and prevent the collision,—then the plaintiff cannot recover."

Of these charges, the court gave the first and eighth as asked, and also gave the seventh with a qualification, (which is not stated fully in the bill of exceptions,) but refused the others; and the defendants excepted to their refusal.

The charges given, and the refusal of the charges asked, are now assigned as error.

R. H. SMITH, and DANIEL CHANDLER, for appellants.
E. S. DARGAN, JNO. T. TAYLOR, and JNO. HALL, *contra.*

A. J. WALKER, C. J.—It is probable that the tendency of the second charge given by the court was to mislead the jury ; but we will not reverse on that account. If in fact the place where the skiff was hitched was safe and secure, except as rendered otherwise by the negligence of defendants' vessel, we suppose it might be affirmed, as a legal proposition, that it was in a proper place. But a skiff would certainly be fastened in an improper place, if hitched so as to be difficult of removal, in the channel along which vessels are frequently passing. The place would be improper, because of the peril to itself, and to other vessels which might be passing.—*The Scioto*, Davies' Rep. 365 ; 1 Parsons on Maritime Law, 201 ; *Strout v. Foster*, 1 How. (U. S.) 89. And it could scarcely be said

.of a vessel thus situated, that it was safe and secure except as it might be affected by negligence in the navigation of some other vessel.

[2.] The third charge given asserts, that a vessel entering a harbor "is bound to keep the *most vigilant* watch." Undoubtedly, a vessel entering a harbor is always bound to exercise great care and diligence.—1 Parsons on Maritime Law, 201; *Culbertson v. Shaw*, 18 How. 584; *Ward v. Dowman*, 6 McLean, 231. The law exacts the exercise of ordinary care. What is ordinary care, must depend upon the circumstances of each case. The degree of vigilance which would be ordinary care on the part of a vessel entering a rarely frequented port in the day-time, would not be ordinary care in a vessel entering a much frequented port, abounding in ships, in a dark night. The law exacts an increase of vigilance with the circumstances which increase its necessity.—*Kelly v. Barney*, 2 Kern. 429; *The Scioto*, Davies' Rep. 361. Whether or not the circumstances of this case were such as to require the very greatest vigilance, was a question for the jury. The court should have instructed the jury to consider the number of vessels accustomed to frequent the port of Mobile, whether it was day-time or night, and any other circumstances in the case affecting the question; and left it to the jury to determine what degree of vigilance was requisite to fill the rule requiring ordinary care. Negligence is, ordinarily, a question for the jury.—*Hibler v. McCartney*, 31 Ala. 506. This charge was erroneous, because it invaded the province of the jury.

[3.] We will be aided to a proper comprehension of the questions raised by the refusals to charge as requested, by ascertaining first some of the leading principles which govern in cases of injuries, resulting from the mutual fault of the two parties. It is a general doctrine, long known in the common law, that where the injury is the result of the concurring faults of the parties, no action accrues to either. In the courts of admiralty, the burden of the injury is apportioned upon equitable principles.—Angell on the Law

Foster v. Holly.

of Carriers, §§ 633, 556. Under the common-law doctrine, which controls in this case, it is not sufficient to preclude the plaintiff's recovery, that he was in fault; but his fault must be such as contributed *proximately* to the injury.—*Steamboat Farmer v. McCraw*, 26 Ala. 189; *Grant v. Moseley*, 29 Ala. 304; Chitty on Carriers, 273; *Trow v. Vermont C. R. R. Co.*, 24 Verm. 487; *Kerwhacker v. Cleaveland, C. & C. R. R. Co.*, 3 Ohio State Rep. 172; *Dowel v. General S. N. Co.*, 5 El. & Bl. 195; *Davies v. Mann*, 10 M. & W. 546; *Cummins v. Presley & Spruance*, 4 How. 315. The negligence which is the proximate cause of injury, and deprives the injured party of a right of action, is that which occurs at the time.—*Trow v. Central R. R. Co.*, *supra*; *Button v. Hudson River R. R. Co.*, 18 N. Y. (4 Smith,) 248; *Harrison v. Berkley*, 1 Strob. 525, 549; *Steamboat Farmer v. McCraw*, *supra*.

It is also a principle belonging to this branch of the law, that although an injury may be occasioned by the defendant's negligence, yet the injured party is entitled to no redress, if by the exercise of ordinary care he might have avoided the consequences of the defendant's negligence. Chitty on Carriers, 273; *Bridge v. Grand Junction R. R. Co.*, 3 M. & W. 244; *Raisin v. Mitchell*, 9 Car. & P. 613 (38 E. C. L. 252).; *Butterfield v. Forester*, 11 East, 60; *Barnes v. Cole & Fitzhugh*, 21 Wendell, 188; *Rathbun v. Payne*, 19 Wendell, 399. This principle seems to grow naturally out of the doctrine which denies a recovery where the plaintiff's negligence has contributed to the production of the injurious result; for the law requires the exercise of care and diligence to avoid injury from another's negligence; and it would seem that the omission of such care and diligence would be negligence, contributing proximately to cause the injury.

[4.] The principles which we have announced, lead us to the proposition, that if the negligence of the defendants' schooner was a cause of the disaster, which is the subject of complaint, then the plaintiff had a cause of action, unless the negligence of the plaintiff's servant, who

was drowned, contributed proximately to the production of the injury; or unless those upon the skiff might, by the exercise of proper care and diligence, have prevented the consequences of the negligence on the part of the defendants' vessel. If the plaintiff's servant and another, being in a skiff, fastened it to a snag in the middle of the channel in front of the city of Mobile, where vessels were frequently passing, and fastened it in such a manner that it could not be conveniently and expeditiously loosed, they were guilty of negligence, because they thus placed themselves in a situation of peril from accidents. But if the skiff, being in that situation, was sunk in consequence of the carelessness of a passing vessel, we cannot say that the fault of so placing the skiff was a *proximate* cause of the injury. It may be regarded as a cause; but the connection between it and the result was not so *immediate*, that it could properly be denominated the *proximate* cause.—See *Harrison v. Berkley*, 1 Strob. 525. That it is not a proximate cause, is copiously illustrated by the decisions in analogous cases, to some of which we refer.

Thus, a flat-boat, culpably running at night, which was struck and sunk by a steamboat, was by this court held not to have proximately contributed to the injury.—*Steamboat Farmer v. McCraw, supra*. A plaintiff, who left his donkey upon the highway, with feet so fettered as to be unable to get out of the way, notwithstanding that was an illegal act, was permitted to recover for the killing of the donkey, through the negligence of one who was passing along the highway with a wagon.—*Davies v. Mann*, 10 M. & W. 546. Where there was a collision between two boats, and, in consequence of the collision, an anchor fell upon the plaintiff's leg and broke it, it was decided, that neither the fact that the anchor was improperly carried, nor the fact that the plaintiff was where he ought not to have been, relieved the defendant, if the collision was caused by his negligence.—*Greenland v. Chaplin*, 5 Excheq. R .(M., H. & G.) 243. A jury returned a verdict for the plaintiff, whose sloop, being at anchor, was struck by the

defendant's vessel, and announced that there were faults on both sides; and the verdict was allowed to stand, because the plaintiff might be in fault, and yet have a right of recovery.—*Raisin v. Mitchell*, 9 Car. & P. 613. See, also, *Trow v. Central R. R. Co.*, 24 Ver. 488; *Kerwhacker v. C., & C. C. R. R. Co.*, 3 Ohio R. 172; *Cook v. Champlain Transportation Co.*, 1 Denio, 91.

It is extremely difficult, if not impossible, to draw the line which divides proximate from remote causes; and it is, therefore, not unreasonable to find the cases on each side of the line so nearly alike as to be scarcely distinguishable. Nevertheless, the authorities to which we have been referred to show that the placing the skiff in the situation described was a proximate cause of the injury, may be distinguished from this case. In some of them, culpable failure to display a light was evidently regarded as an immediate cause of a collision at night, and as the omission of a duty at the time which contributed to the injury.—*Dowell v. Gen. Nav. Co.*, 5 Ellis & Blackburn, 195; *Rathbun v. Payne*, 19 Wend. 399; *Barnes v. Cole & Fitzhugh*, 21 ib. 188. In the case of *Button v. Hudson River R. R. Co.*, (18 N. Y. 248,) it appeared that the man, for the killing of whom the action was brought, within six minutes before the arrival of a train of cars, placed himself with his head upon the track on one side, and with his feet upon the other, and, not being seen until it was too late to stop the cars, was killed. The court, in reference to those facts, presuming the deceased to have been in his senses, said, that the deceased must be regarded as having courted his own destruction, and co-operated with the defendants in its production. The distinction between that case and this is too manifest to render comment necessary; and an examination of the decision will show that it fully recognizes the principles which we have announced. Although there may have been a fault in the placing of the skiff in the situation described in the record, yet the plaintiffs may recover, if the defendants' negligence caused the injury, and those who were in the management of the skiff could not

by the exercise of proper diligence, have avoided the consequence of the defendants' negligence.—*Bridge v. Grand Junction Railway Co.*, 3 M. & W. 244.

It follows from what we have said, that the improper placing of the skiff constituted no defense against the liability of the defendant for negligence directly operating to cause the injury; but that if the persons in the skiff could have released it from the snag, and avoided the threatened collision, by the use of reasonable care and diligence, and did not do so, then the defendant is not liable, although the negligence of his vessel may have contributed to the production of the disaster.

We now proceed to test the correctness of the several refusals to charge by the principles above set forth. The second charge requested was properly refused, because, assuming upon the facts stated that those in the skiff could, by the use of proper diligence, have avoided the disaster, it makes the defendants' exemption from liability depend upon the failure to use timely efforts to loose the skiff and get out of the way. The question should have been left to the jury, whether, by the use of proper diligence, those in the skiff could have loosed her and got out of the way. The refusal to give the third charge was proper, because the tendency of the charge was to mislead the jury, by producing the impression, that the placing the skiff as it was placed was, in itself, an act which, for the purposes of this trial, rendered the plaintiff chargeable with negligence. There was no error in the refusal of the fourth and sixth charges requested, for the negligent act mentioned in them was only a remote cause of the injury. The fifth charge requested was in strict accordance with one of the principles which we have laid down in the foregoing opinion, and ought to have been given. The 7th charge as requested is not fully copied into the transcript, and we are unable to pass advisedly upon it. The 9th charge requested was erroneous, because it excludes from the consideration of the jury the question, whether the defendants' vessel was not guilty of negligence, on account of the failure to see

the skiff, and to take steps for avoiding the collision sooner than it did.

The judgment of the court below is reversed, and the cause remanded.